UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEATRIX ELIZABETH CANTU WYNN,

        Plaintiff,                            Civil Action No. 08-14879

v.                                  HON.  PAUL D. BORMAN
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Beatrix Elizabeth Cantu Wynn brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On, February 23, 2004, Plaintiff filed a claim for DIB, alleging disability as of February 18, 2004 (Tr. 45).  After the initial denial of her claim, Plaintiff requested an administrative hearing, held on January 30, 2008 in Detroit, Michigan (Tr. 565).

Administrative Law Judge ("ALJ") Kathryn D. Burgchardt presided (Tr. 565). Plaintiff, represented by attorney Lisa Welton, testified, as did Vocational Expert ("VE") Richard Szydlowski (Tr. 570-600, 601-607). On March 26, 2008, ALJ Burgchardt determined that Plaintiff was not disabled (Tr. 24). On September 22, 2008, the Appeals Council denied review (Tr. 6-8). Plaintiff filed for judicial review of the final decision on November 21, 2008.

**BACKGROUND FACTS**

Plaintiff, born November 12, 1958, was 49 when ALJ Burgchardt issued her decision (Tr. 45). She completed high school and worked previously as a cashier and kitchen worker (Tr. 82-83, 89). Her application for benefits claims disability as a result of shoulder, arm, and leg problems (Tr. 81).

**A.     Plaintiff's Testimony**

Plaintiff testified that she graduated from high school, but denied further education (Tr. 571). She reported that although she underwent surgery in April, 2004, she continued experience postural difficulties (Tr. 571). She alleged that she was unable to sit for more than five minutes at a time or stand or walk for more than ten (Tr. 572-573). Plaintiff testified that she had been using a brace since May, 2004 (Tr. 573). She indicated that gripping limitations prevented her from lifting even a half gallon milk, adding that she experienced difficulty brushing her hair (Tr. 573). Plaintiff stated that her left hand was weak and reaching upward with her right hand created neck pain (Tr. 573). She noted that she held a valid driver's license but had not driven since April, 2004 (Tr. 575). She denied using a computer, singing, gardening, fishing, or reading books or magazines (Tr. 575). She

reported that hip pain precluded walking and physical therapy (Tr. 575).

Plaintiff testified that she lived with her husband and the youngest of her two children (Tr. 576). She denied tobacco, alcohol, or illegal drug use; going to church or the movies; or eating out with family or friends, noting that her allergies to "a lot of smells" brought on asthma attacks (Tr. 577). She reported that as a result of her February, 2004 workplace accident, she received a settlement in February, 2007 (Tr. 577). Plaintiff indicated that she saw her primary care physician once or twice a year, her physical rehabilitation doctor once a month, and her urologist on an "as needed" basis (Tr. 578). She added that her orthopedic specialist was currently completing a series of tests (Tr. 579). Plaintiff, stating that she had health insurance, reported that she currently took Vicodin, Preventil, Elmiron, Ogen, Aciphex, a Lidoderm patch, and Estrace cream (Tr. 579-580).

Plaintiff reported that she worked from 1999 to 2004 for Southgate Community Schools as both a cashier and kitchen helper, noting that she worked full time only in 2002 and 2003 (Tr. 580-581). She stated that she typically arose at 8:00 a.m. but spent most of the day reclining on her left side, adding that she experienced nighttime sleep disturbances (Tr. 582). She denied doing laundry, grocery shopping, yard work or housecleaning (Tr. 583-584). Plaintiff alleged that her food preparation was limited to preparing a bowl of cold cereal (Tr. 584).

In response to questioning by her attorney, Plaintiff noted that she had been diagnosed with interstitial cystitis, creating level seven or eight vaginal pain on a scale of one to ten (Tr. 584). She also testified that a bladder condition required her to urinate approximately

-3-

"20-28" times in a 24-hour period, adding that she had recently undergone a second bladder operation (Tr. 585-586). She reported that since the latter surgery, she experienced ongoing incontinence (Tr. 592). Plaintiff testified that for the past two years, her husband worked the afternoon shift so he would be available to care for her during the day (Tr. 593). She indicated that left knee problems prevented her from climbing stairs (Tr. 594). Plaintiff alleged that her shoulder, hip, knee, ankle, and thigh problems originated with her February, 2004 work accident (Tr. 594). She reported that left side weakness prevented her from walking any distance or gripping with her left hand (Tr. 594). Plaintiff alleged that physical therapy, chiropractic treatment, manipulation, and pain pills had not improved her condition (Tr. 595). She reported that she was scheduled to undergo testing for Multiple Sclerosis the following month (Tr. 595).

Plaintiff also alleged restless leg syndrome (Tr.596). She estimated that she slept one hour per 24-hour period and divided her waking hours between reclining and going to the bathroom, adding that she experienced irritable bowel syndrome (Tr. 597). She reported using a back brace while reclining (Tr. 597). Plaintiff concluded her testimony by stating that Vicodin made her drowsy, Elmiron created eyelash loss (increasing her sensitivity to sunlight) and that she was allergic to antihistamines, decongestants, sulphur drugs, plastics, pesticides, chemicals, perfumes, cleaners, mouthwashes, and gum (Tr. 600).

### B.    Medical Evidence

### 1.  Treating Sources

On February 18, 2004, Plaintiff sought medical treatment after slipping and falling at

-4-

work, landing on her left knee and leg and hitting her shoulder on a restroom door (Tr. 130). Upon examination, Plaintiff exhibited a normal range of motion in all directions, but reported moderate shoulder pain (Tr. 130). She was released for a work return two days later subject to the restrictions of no repetitive lifting or pushing and pulling over 10 pounds and no prolonged standing or walking (Tr. 122). On February 20, 2004, Plaintiff exhibited grip strength of 25 pounds on the left and 40 on the right (Tr. 126). Physical therapy notes from the following week show that she reported a 50 percent improvement (Tr. 112). In March, 2004, Plaintiff reported continued shoulder discomfort and constant throbbing of the left knee (Tr. 191, 434, 441). An MRI of the right shoulder was normal with the exception of a "grade 2 medial meniscus tear" (Tr. 451, 453). Plaintiff was cleared for work subject to restrictions (Tr. 184, 444). In April, 2004, Lance R. Chaldecott, M.D. advised Plaintiff to consider left knee arthroscopy (Tr. 448). After a failed work attempt, Plaintiff underwent arthroscopic surgery for a medial meniscus tear of the left knee the same month (Tr. 133, 457, 532).

May, 2004 treating notes by surgeon Kevin J. Sprague, M.D. indicate that Plaintiff's pain had resolved (Tr. 459). Plaintiff indicated was able to dress, tend to her personal needs, eat, and perform light housework without significant difficulty (Tr. 466). The following month, venous doppler testing yielded normal results (Tr. 244, 462). In June, 2004, Plaintiff told a physical therapist that leg stiffness precluded putting on socks or trousers by herself (Tr. 206 ). The same month, Plaintiff reported that her pain had decreased 50% since undergoing knee surgery (Tr. 472). July, 2004 x-rays of the pelvis showed normal findings (Tr. 476).

September, 2004 treating notes indicate that despite complaints of leg pain, an EMG of the left lower extremity and an MRI of the left hip were normal (Tr. 137, 243, 486-487). Plaintiff exhibited a full range of motion and a "markedly improved gait" (Tr. 484, 493). C. Mangalick, M.D. suggesting that Plaintiff's symptoms arose from tendinitis of the adductor muscle, recommended physical therapy and exercise (Tr. 138-139, 487-488). Physical therapy discharge notes from the following month indicate that Plaintiff improved her posture, experiencing level three or four pain on a scale of one to ten (Tr. 142, 501). Mini B. Goddard, M.D. found that decreased but "visible" left knee swelling currently prevented Plaintiff from returning to her job as head cashier (Tr. 149, 154, 156). In November, 2004, Plaintiff reported that electrical stimulation administered during physical therapy made her left leg symptoms worse (Tr. 149). The following month, Dr. Sprague observed "no instability" or "evidence of meniscal injury," but nonetheless found Plaintiff unable to return to her former job (Tr. 157, 505).

In February, 2005, Dr. Sprague noted that Plaintiff reported level "2 to 3" pain (Tr. 219, 509). Opining that Plaintiff was capable of "restricted duty" work, he recommended "a return to work program" (Tr. 219, 509). The following month, imaging studies of the left shoulder yielded normal results (Tr. 242, 325). Imaging results of the cervical spine showed only mild degenerative changes (Tr. 241, 328, 379). In April, 2005, an EMG was negative for Carpal Tunnel Syndrome ("CTS") (Tr. 209, 326, 377). The same month, an MRI of the left shoulder showed a "small partial thickness tear" of the supraspinatus tendon (Tr. 211, 378). Plaintiff exhibited a good range of hip motion with increased muscle strength (Tr.

525).

In May, 2005, Anne Abrahamson, M.D. noted that Plaintiff was continuing home exercises (Tr. 265). Plaintiff was advised to lose weight and use pool therapy (Tr. 266). Dr. Sprague advised Plaintiff "to push herself on a home exercise program," noting that "no additional orthopedic intervention is required" (Tr. 212). He referred her to a pain clinic for continued complaints of discomfort and limitation (Tr. 212). In June, 2005, Plaintiff reported that pool therapy increased her discomfort (Tr. 268). Dr. Abrahamson re-prescribed Elavil (Tr. 269). July, 2005, occupational therapy discharge notes state that Plaintiff "ha[d] made no progression toward stated goals" (Tr. 223). Plaintiff told Dr. Abrahamson that she sought emergency medical treatment after occupational therapists tried to make her to walk backwards (Tr. 271 *see also* 405-407). Dr. Abrahamson commented as follows:

> "I did explain to her that if I cannot find a reason for her weakness and/or a diagnosis, that I will be unable to provide her long term handicapped permits, as I have no explanation for her weakness and it [is] most likely that she would actually benefit from the additional exercise"

(Tr. 273).

A left knee MRI taken the same month indicated normal quadriceps and patellar tendons with only mild abnormalities of the lateral facet patella (Tr. 239). Dr. Abrahamson, presenting the imaging results to Plaintiff, remarked that "[Plaintiff] then perseverated on the fact that she actually is having the most discomfort now with her left arm," telling the physician that she believed that she was having a reaction to the "color of [a] pill" that had been prescribed (Tr. 278). Dr. Abrahamson referred Plaintiff for neuropsychological

examination (Tr. 278).  The following month, Dr. Abrahamson, noting that Plaintiff declined to follow through with psychological treatment, again found  "no pathology" (Tr. 281).

Imaging studies from September, 2005 showed "mild-to-moderate . . . narrowing of the medial compartment" but otherwise normal results (Tr. 238).   Imagining studies of the left humerus, left shoulder, and brain were all normal (Tr. 235-237).  Likewise, a "whole body" bone scan was normal (Tr. 233).  In October, 2005, cardiologist Michael R. Denike examined Plaintiff, finding her cardiac condition "normal" (Tr. 229, 231, 403).  In January, 2006, Dr. Sprague again found no orthopaedic explanation for Plaintiff's claims of continued discomfort (Tr. 245, 536).  The following month, a pelvic ultrasound found an uterine fibroid but was otherwise unremarkable (Tr. 247).  Likewise, a bilateral carotid arterial and lower extremity ultrasounds were negative for abnormalities (Tr. 383). A colonoscopy was likewise normal (Tr. 396).  In March, 2006, Plaintiff sought emergency treatment for dyspepsia (Tr. 432).  Results of a  esophagogastroduodenoscopy ("EGD") were normal (Tr. 433).

In April, 2006, a cystoscopy showed evidence of interstitial cystitis (Tr. 371).  David Law, M.D. prescribed Elmiron (Tr. 371).  The same month, Plaintiff underwent a dilation and curettage for uterine fibroids (Tr. 333-334).  In May, 2006, Plaintiff told a treating source that the recent procedure had "messed around" with her bladder (Tr. 297).  Dr. Law imposed work restrictions of "unrestricted access to restroom" and "no prolong[ed] sitting due to condition of interstitial cystitis (Tr. 374).  CT scans of the abdomen and pelvis performed in June, 2006 showed renal calcifications but otherwise normal bladder function (Tr. 375).  In July, 2006, an MRI of the lumbar spine showed mild degenerative changes with "no

-8-

significant canal stenosis" (Tr. 329, 385). An August, 2006 MRI of the lumbar spine yielded normal results (Tr. 299). The same month, Plaintiff underwent a hysterectomy without complications (Tr. 354-355).

In October, 2006, Dr. Sprague, noting "no structural abnormalities" of the left shoulder, hip, or knee, reiterated that "[n]o orthopedic intervention [was] required" (Tr. 538). In February, 2007, Danny F. Watson, M.D., noting Plaintiff's recent hysterectomy, remarked that Plaintiff reported left arm numbness following the April, 2004 knee surgery (Tr. 261). She also complained of a burning sensation while urinating (Tr. 261). Dr. Watson, noting that objective medical tests had yielded mostly normal findings, found "no objective findings on examination beyond the slight atrophy about the left shoulder" (Tr. 262).

In March, 2007, Plaintiff, noting that she drove herself to her medical appointment, reported vaginal pain (Tr. 316). May, 2007 MRIs of the brain and cervical spine were negative for the "MRI criteria for multiple sclerosis" (Tr. 331). The following month, imaging studies of the lower extremities were normal (Tr. 386-387). In July, 2007, Plaintiff reported that she was "in pain all the time" (Tr. 318). The following month, treating notes indicate that Plaintiff was planning to travel to Virginia (Tr. 319). In September, 2007, imaging studies of the thoracic and lumbar spine showed "mild to moderate facet arthritis" of the lumbar and lumbar sacral spine (Tr. 388). An MRI showed lumbar spondylosis at L3-4, L4-5 (Tr. 544). Plaintiff indicated that she wished to continue non-surgical treatment (Tr. 544). The following month, Plaintiff was diagnosed with a heel spur (Tr. 412-413). She reported initial improvement from the use of an unna boot, but treating notes from

-9-

November, 2007 treating notes indicate that nerve block injections increased her pain (Tr. 414, 415). Treating notes indicate that Plaintiff was prescribed Elavil (Tr. 553).

In November, 2007, Plaintiff underwent a retrograde cystography (Tr. 322). Dr. Law, noting a history of interstitial cystitis with stress incontinence, found a "grossly normal" urinary bladder but pelvic floor weakness (Tr. 322). The same month Razmig A. Haladjian, M.D., noting "generalized pain and weakness on the left side," remarked that "the etiology of the pain is not very clear to me." (Tr. 399). He recommended a "full psych evaluation" (Tr. 399). Flora Dean, M.D. noted that Plaintiff rebuffed suggestions that she seek mental health treatment (Tr. 551).

In January, 2008, Plaintiff underwent a cystocele and urethrocele repair without complications (Tr. 389). Dr. Dean, discussing Plaintiff's history of "diffuse pain" noted that she had not followed up on a recommendation for either a second opinion regarding her physical problems or a psychiatric evaluation (Tr. 549). The following month, Dr. Dean noted Plaintiff's complaints of myofascial, neck, and low back pain (Tr. 547).

The same month, Dr. Dean completed a "Treating Physician Medical Questionnaire," finding that Plaintiff experienced chronic myofacial, neck, and low back pain (Tr. 257). Dr. Dean found that Plaintiff was unable to stand for more than a few minutes, with a moderately limited ability to reach, pull, push, twist (manipulative), bend, squat, kneel, climb, and balance, with slight balancing and twisting (postural) limitations (Tr. 259). She found that Plaintiff's condition would oblige her to miss at six days of work each month (Tr. 259).

## 2. Non-Treating Sources

-10-

A March, 2006 Residual Functional Capacity Assessment conducted on behalf of the SSA found that Plaintiff could lift 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation in all extremities (Tr. 250). The Assessment limited Plaintiff to frequent (as opposed to *constant*) stooping and *occasional* climbing of ramps and stairs, balancing, kneeling, crouching, and crawling, but precluded all ladder, rope, or scaffold climbing (Tr. 251). Plaintiff was limited to occasional overhead reaching with the left arm (Tr. 252). The Assessment found the absence of visual, communicative, or environmental limitations, concluding that Plaintiff's claims of incapacitation were only partially credible (Tr. 252-254).

### 3. Material Submitted Subsequent to the ALJ's Determination

In May, 2008, Hope K. Haefner, M.D. recommended physical therapy for Plaintiff's complaints of vaginal pain (Tr. 561-562). In June, 2008, Dr. Law remarked that Plaintiff complained of continuing pain, but noted Urelle improved symptoms of urinary urgency (Tr. 564).

### C.    Vocational Expert Testimony, September 13, 2005

VE Richard Szydlowski classified Plaintiff's past work as a cashier as semiskilled at the light exertional level and kitchen work as unskilled and medium[1] (Tr. 602). The ALJ

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with

-11-

then posed the following set of limitations to the VE, taking into account Plaintiff's age,

education, and work background:

> "[A]ssume that this individual could only lift or carry up to ten pounds
> frequently and 20 pounds occasionally.  The individual would require a
> sit/stand option while remaining at the work station, meaning that the
> individual could sit or stand at will while performing assigned duties.  The
> individual could stand or walk with normal breaks for a total of six hours in an
> eight-hour workday and the individual may use an assistive device to
> ambulate.  The individual could sit with normal breaks for a total of six hours
> in an eight-hour workday.  The individual could perform pushing and pulling
> motions with upper and lower extremities but within the weight restrictions
> given.   The individual should be restricted to a relatively clean work
> environment, meaning low levels of pollutants.  The individual could perform
> postural activities but only occasionally and that would be climbing, balancing,
> crouching, kneeling and crawling.  However, the individual could not climb
> any ladders, ropes or scaffolds.  The individual should avoid a high noise
> environment and the individual should avoid overhead reaching on the left."

(Tr. 603).

The VE replied that the above limitations precluded Plaintiff's former work but would

allow  the performance of the semiskilled work of a cashier/checker (6,000 in the

Southeastern Michigan region) as well as exertionally light jobs of  unskilled cashier

(10,000),  security worker (1,400),  machine tender (1,200),  assembler  (1,700),

inspector/checker (1,000), and door greeter/receptionist (2,000) (Tr. 601).

The VE next testified that if the hypothetical person were further limited to sedentary

work and the use of "an assistive device to ambulate with," the individual could perform the

---

frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

work of a document preparer/envelope stuffer (2,000), assembler (2,000), inspector/checker (1,000), and cashier (1,000), noting that while the Dictionary of Occupational Titles ("DOT") classified the cashiering position as exertionally *light*, his testimony was otherwise consistent with the DOT (Tr. 605-607).  The VE found that if the individual were unable "to sustain concentration, persistence and pace necessary to consistently fulfill work for eight hours a day, five days a week," she would be precluded from all work (Tr. 605-606).   In response to questioning by Plaintiff's attorney, the VE found that if the individual were required to take a bathroom break for five minutes each hour, the job findings would not be affected, but if the individual needed to work near a bathroom, approximately 50 percent of the sedentary positions would be eliminated (Tr. 607).

    **D.**    **The ALJ's Decision**

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of "back pain; status post left knee surgery; partial tear of tendon at left shoulder; asthma; and hearing impairment," determining however that none of the impairments met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 18).  Acknowledging Plaintiff's more recent claims of cystitis, the ALJ determined that the condition did not create workplace restrictions for "12 consecutive months" was thus not "severe" (Tr. 19).  She found that while Plaintiff was unable to perform any of her past relevant work, she retained the residual functional capacity ("RFC"):

> "To perform lifting and carrying of less than 10 pounds frequently; and 10 pounds occasionally; she would require a sit/stand option; she could stand/walk (with normal breaks) for a total of two hours in an eight-hour workday and may use assistive device

to ambulate; she can sit (with normal breaks) for a total of six hours in an eight-hour workday; she can perform pushing and pulling motions with her upper and lower extremities within the aforementioned weight restrictions; she should be restricted to a "relatively clean" work environment (low levels of pollutants); she could perform each of the following postural activities occasionally: climbing, balancing; crouching, kneeling, and crawling; she should never climb ladders, ropes, or scaffolds; she should avoid high noise environment; and she should avoid overhead reaching on the left"

(Tr. 19-20). Adopting the VE's job findings regarding the sedentary positions, *supra*, the ALJ found that Plaintiff could perform a significant range of sedentary work (Tr. 23).

The ALJ found Plaintiff's allegations of limitations "not credible to the extent they are inconsistent with the residual functional capacity assessment" (Tr. 21). She cited a March, 2004 treating source conclusion that Plaintiff was capable of sedentary work with postural limitations (Tr. 20). She also noted that Drs. Abrahamson and Sprague found no objective medical reason for Plaintiff's alleged pain and weakness (Tr. 22).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

-14-

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff argues first that the ALJ did not consider her limitations as a result of interstitial cystitis ("IC") in crafting the RFC. *Plaintiff's Brief* at 31-39, *Docket #*9. Next, she contends that the ALJ failed to give appropriate weight to the opinions of Drs. Law or Dean. *Id.* at 39-43. Third, Plaintiff submits that the ALJ's credibility determination was based on an erroneous reading of the record. *Id.* 43-46. Citing *Varley v. HHS,* 820 F.2d 777 (6th Cir. 1987), Plaintiff argues last that the hypothetical questions posed to the VE did not account for her full degree of limitation. *Plaintiff's Brief* at 46-47.

### A.  The ALJ's Step Two Findings/Interstitial Cystitis ("IC")

Plaintiff argues that the ALJ erred in failing to include her diagnosed conditions of Chronic Pain Syndrome, IC, Irritable Bowel Syndrome; Vulvodynia; Restless Leg Syndrome; Insomnia; Obesity; and Depression among her "severe" impairments at Step Two. *Id.* at 31. She contends in particular that the ALJ's finding that IC was a non-severe impairment is based on an erroneous reading of the record.[2] *Id.* at 31-32. She takes issue

---

[2]

*WebM.D.* describes interstitial cystitis as "a chronic, painful inflammatory condition of the bladder wall characterized by pressure and pain above the pubic area along with increased frequency and urgency of urination." http://www.webmd. com/a-to-z-guides/interstitial-cystitis-11327.

-16-

with the ALJ's citation of a "grossly normal" November 15, 2007 urethrocystography for the proposition that the IC had resolved, contending that the test result did not establish the absence of IC. *Id.* at 32(*citing* Tr. 19).

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." An impairment can be considered "not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985) (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).

Plaintiff's brief contains a one-sentence contention that the ALJ erred by failing to discuss allegations of Chronic Pain Syndrome, Irritable Bowel Syndrome, vulvodynia, Restless Leg Syndrome, insomnia, obesity, and depression. *Plaintiff's Brief* at 32. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *In re Travel Agent Com'n Antitrust Litigation,* — F. 3d — , 2009 WL 3151315, *3 (6th Cir. 2009)(*citing United States v. Phinazee,* 515 F.3d 511, 520 (6th Cir.2008)). [3]

---

[3]

Further, Plaintiff's application for benefits omits any mention of limitations as a result of these conditions (Tr. 58, 81).  While she alleged at the hearing that restless leg syndrome

In contrast, Plaintiff submits a better developed argument that IC created workplace limitations lasting over 12 months. Citing SSR 02-2p, she faults the ALJ's reliance on imaging results from June, 2006 and November, 2007, contending that the tests do not establish the absence of IC. *Plaintiff's Brief* at 32-38. Consistent with this argument, "Social Security Ruling 02-2p expressly recognizes that interstitial cystitis is a diagnosis of exclusion because there is currently no definitive test to identify the disorder." *Roush v. Barnhart,* 326 F.Supp.2d 858, 869 (S.D.Ohio 2004)(*citing* SSR 02-2p, TITLES II AND XVI: EVALUATION OF INTERSTITIAL CYSTITIS(November 5, 2002)).

Nonetheless, the finding that IC did not create workplace impairments for 12 continuous months reflects a reasonable reading of the transcript. As discussed above, Dr. Law diagnosed Plaintiff with IC in April, 2006 (Tr. 371). The following month, he imposed a work restriction of "unrestricted access to restroom/ no prolong[ed] sitting" due to IC (Tr. 374). In June, 2006, a CT scan showed a normal-appearing urinary bladder (Tr. 375). Although Plaintiff criticizes the ALJ for citing the June, 2006 test in support of the finding

---

prevented her from sleeping more than one hour per night (Tr. 596) and irritable bowel syndrome obliged her to remain near a bathroom at all times (Tr. 596), the record either does not show that these conditions created workplace limitations lasting over 12 months or that they required ongoing treatment (*see* Tr. 266, 396, 398, 540, 544). Neither Plaintiff nor her treating sources ever suggested that obesity created even minimal impairments. Further, treating records from November, 2007 (including references to "Chronic Pain Syndrome," indicate that Plaintiff's claims of ongoing pain were largely uncorroborated by objective studies (Tr. 399). As discussed below, claims that vaginal pain and vulvodynia created workplace limitations is unsupported by the record. Finally, while Plaintiff now complains that the ALJ ignored her limitations as a result of depression, her treating records show that she rebuffed even suggestions that she undergo a psychiatric evaluation on numerous occasions (Tr. 278, 281, 399, 551).

that the condition did not meet the 12-month durational requirement, I note that the record is devoid of any indication that Dr. Law ever renewed the "restroom proximity" restrictions. Even assuming that the ALJ misinterpreted the June, 2006 records, support for Plaintiff's contention that IC created *continuous* work-related limitations is largely absent from the transcript. Even more compellingly, September, 2007 treating notes indicate that Plaintiff denied any "bowel or bladder dysfunction" (Tr. 540).

Further, while records created in February, 2007 contain Plaintiff's claim that she needed to urinate once an hour (Tr. 261), the VE testified at the administrative hearing that the need to urinate once an hour (taking her off task for five minutes) "would not have a significant impact" on the job findings (Tr. 607). Treatment notes created in the month following the January, 2008 surgery include claims by Plaintiff that she needed to urinate once an hour, but do not suggest significantly greater limitations.[4] Finally, even if Plaintiff's

---

[4]
Further, June, 2008 treating notes created subsequent to the administrative decision indicate that the drug Urelle improved symptoms of urinary urgency (Tr. 564). This material, submitted subsequent to the administrative decision, is subject to a narrow review by the district court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993). Where the Appeals Council denies a claimant's request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Id.* at 695-96. Sentence Six of 42 U.S.C.A. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but *only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . .*" (emphasis added). Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g). A review of the newer records indicates that a Sentence Six remand is not warranted. June, 2008 examination notes indicate a preliminary diagnosis of vulvodynia, but do not suggest that the condition created work-related limitations (Tr. 562). While the examining physician noted a history of "chronic fatigue," this was apparently based on

allegation that she required work in close proximity to a restroom were fully credited, the VE testified that this restriction, added to the hypothetical limitations adopted by the ALJ, would not prevent Plaintiff from performing approximately 2,000 jobs in the regional economy (Tr. 607). Because this constitutes a "significant" number of jobs under Sixth Circuit case law, the ALJ's omission from either her Step Two findings or the hypothetical limitations, amounts to at worst, harmless error. *See Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

### B. The Treating Physician Analysis

Plaintiff argues next that the ALJ failed to give appropriate weight to the opinions of Drs. Law and Dean. *Plaintiff's Brief* at 41-42. Plaintiff, noting Dr. Law is a urologist and Dr. Dean a physiatrist, faults the ALJ for instead adopting a non-specialist source's February, 2004 assessment of her abilities. *Id.*

### 1. Basic Principles

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight."

---

Plaintiff's own claims (Tr. 562). Further, Dr. Law's observation that Urelle improved Plaintiff's urinary condition undermines rather supports the disability claim (Tr. 564).

-20-

*Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing*

*Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004)).  Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ
> must apply certain factors--namely, the length of the treatment relationship and the
> frequency of examination, the nature and extent of the treatment relationship,
> supportability of the opinion, consistency of the opinion with the record as a
> whole, and the specialization of the treating source--in determining what weight to
> give the opinion."

*Wilson,* at 544.

Regardless of whether substantial evidence is found elsewhere in the record to

contradict the source's findings, the ALJ is required nonetheless to give "good reasons"

for rejecting the treating physician's opinion:

> "'The requirement of reason-giving exists, in part, to let claimants understand
> the disposition of their cases,' particularly in situations where a claimant
> knows that his physician has deemed him disabled and therefore 'might be
> especially bewildered when told by an administrative bureaucracy that she is
> not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).  The mere fact that a

treating physician's opinion is contradicted by another source is not a sufficient basis for its

rejection.  *Hensley* at 266 ("Nothing in the regulations indicates, or even suggests, that the

administrative judge may decline to give the treating physician's medical opinion less than

controlling weight simply because another physician has reached a contrary conclusion.").

However, in the presence of contradicting substantial evidence, the ALJ may  reject all or a

portion of the treating source's findings.  *Warner v. Commissioner of Social Sec.,* 375 F.3d

387, 391 -392 (6th Cir. 2004).

## 2.  Application to the Present Case

The ALJ's "treating physician" analysis, both procedurally and substantively correct, does not present grounds for remand.   First, I disagree with Plaintiff's assertion that the ALJ either discounted or gave inadequate weight to Dr. Law's opinion.   The administrative opinion, containing a thorough discussion of  Plaintiff's IC treatment, does not dispute the urologist's findings (Tr. 19).     While Plaintiff disputes the ALJ's conclusion that the condition did not meet the 12-month durational requirement, Dr. Law's May, 2006 recommendation that Plaintiff should have unlimited restroom access (noted by the ALJ) is unaccompanied by later indications that she experienced the same level of impairment on an ongoing basis.

Second, I disagree that the ALJ performed an inadequate analysis of Dr. Dean's January, 2008 opinion. Plaintiff contends that the ALJ erred in rejecting Dr. Dean's opinion in favor of a less restrictive February, 2004 assessment (Tr. 260).   Consistent with *Wilson,* the ALJ provided more than adequate reasons for rejecting Dr. Dean's opinion, noting that the physiatrist had been treating Plaintiff for only five months at the time of the January, 2008 assessment (Tr. 22).   Acknowledging Dr. Dean's status as a treating source, the ALJ nonetheless permissibly found that the opinion stood at odds with substantial evidence found throughout the record.

Further, while Plaintiff criticizes the ALJ for adopting a February, 2004 opinion by

a physician of unknown specialty over Dr. Dean's later assessment, this is a red herring.  In fact, the ALJ's rejection of Dr. Dean's assessment was based on the records created by *multiple* treating sources.  In February, 2005, Dr. Sprague, repeatedly observing the absence of objective medical evidence supporting Plaintiff's allegations of extreme limitation, opined that she was capable of returning to work with restrictions.  Dr. Abrahamson, noting that objective medical testing showing essentially normal results contradicted Plaintiff's claims of limitation, refused to provide her with a long term handicapped permit, remarking that "she would actually benefit from the additional exercise" (Tr. 22 *citing* 273).  Confronted with imaging results showing "no pathology," Plaintiff responded with the dubious claim that her primary problem was now left arm weakness as a result of an allergic reaction to the color of a pill (Tr. 278).  The ALJ's rejection of Dr. Dean's opinion was well articulated and amply supported by record evidence.

## C.  The Credibility Determination

 Plaintiff also submits that the ALJ's credibility determination was based on an erroneous reading of the record.  *Id.* 43-46.  Citing SSR 96-7p, she contends that the ALJ improperly rejected her allegations of limitation.  *Id.*

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms.  *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986).  "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically

-23-

acceptable clinical and laboratory diagnostic techniques." *Id.*   Plaintiff disputes this portion of the ALJ's credibility determination, arguing that "there are numerous objectively established medical conditions that could reasonably be expected to produce [her] subjective complaints of chronic pain, fatigue, and urinary frequency."

Contrary to this argument, the ALJ issued a well developed credibility determination. As discussed *supra,* the finding that  IC limitations did not meet the 12-month durational requirement reflects a reasonable reading of the record.  As to claims of chronic pain and fatigue, numerous treating sources commented that objective medical testing contradicted Plaintiff's allegations.   While Plaintiff points out that the transcript contains scattered references to muscle atrophy, she fails to note that it also contains indications that she exhibited good muscle tone 15 months after the workplace accident (Tr. 525).

Plaintiff's argument that the ALJ did not conduct a proper analysis of her subjective allegations of limitation is also without merit.[5]  She criticizes the ALJ for failing to address

---

[5]After determining whether objective criteria support the claim, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record."  C.F.R. 404.1529(c)(3), 416.929(c)(3) lists the factors to be considered in evaluating  the making the determination:

"(i) Your daily activities; (ii) The location, duration, frequency, and
intensity of your pain or other symptoms; (iii) Precipitating and aggravating
factors; (iv) The type, dosage, effectiveness, and side effects of any
medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief
of your pain or other symptoms; (vi) Any measures you use or have used to
relieve your pain or other symptoms (e.g., lying flat on your back, standing

-24-

claims that she no longer drives and that she requires assistance from family members to perform personal care needs.  However,  Plaintiff's claims that she reclines most of the day next to a bathroom and is capable only of pouring cold cereal into a bowl are undermined by, if nothing else, her failure to follow multiple treating source recommendations that she pursue neuropsychological explanations for her "limitations" (Tr. 278, 281, 399, 551).  Plaintiff testimony that she had not driven since April, 2004 (Tr. 575) contradicts March, 2007 treating notes showing that she drove herself to the exam (Tr. 316).

Likewise, although Plaintiff alleged a degree of limitation implying the need for practically institutional level care, treating notes also show that she declined to consider aggressive treatment for her physical limitations (Tr. 544).  Although Plaintiff faults the ALJ for failing to mention that her husband allegedly changed work shifts to care for her,  the ALJ was not required to discuss every scrap of evidence supporting Plaintiff's disability claim in light of substantial evidence supporting the opposite conclusion. "While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Commissioner of Social Security,*  2006 WL 305648, *8-9 (6th Cir. 2006)(*citing Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)).  Accordingly, the deference generally given to

---

for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

an ALJ's credibility determination is appropriate here.  *See Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *See also Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").


### D.  The Hypothetical Question

Citing *Varley v. HHS,* 820 F.2d 777 (6th Cir. 1987), Plaintiff argues that the hypothetical questions posed to the VE did not account for her full degree of limitation. *Plaintiff's Brief* at 46-47.  *Varley* sets forth the Sixth Circuit's requirements for a hypothetical question.  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments" (internal citations omitted). *Id.* at 779; *See also Webb v. Commissioner of Social Sec*. 368 F.3d 629, 632 (6th Cir. 2004).

Plaintiff argues that the omission of "chronic pain, fatigue, and urinary urgency from the hypothetical limitations invalidates the VE finding that she could perform a significant range of sedentary work.  *Plaintiff's Brief* at 47.  However, as discussed above, because the ALJ's rejection of both the range and severity of Plaintiff's alleged conditions was well supported by substantial evidence, she was entitled to exclude them from her questions to the VE.   *See Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6[th]

Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28
(6th Cir.1987)("An ALJ is not obliged to incorporate unsubstantiated complaints into his
hypotheticals")).[6]

In closing, the Court notes that it recommendation to uphold the administrative
findings should not be interpreted to trivialize legitimate health concerns.   Nonetheless,
despite the fact that Plaintiff's counsel has scoured the record for reversible error, the ALJ's
decision is easily within the "zone of choice" accorded to the fact-finder at the administrative
hearing level and should not be disturbed by this Court.   *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary
Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be
DENIED.

Any objections to this  Report and Recommendation must be filed  within ten (10)
days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich.
LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right
of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard
v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947

---

[6] Moreover, in response to questioning from Plaintiff's attorney, the VE addressed
the issue of urinary frequency, testifying that it would not significantly affect the job
numbers.  Thus, even if the ALJ erred in omitting urinary urgency from the hypothetical
question, the error was harmless. *See* Sec. A, *supra*.

(6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE


Dated:  November 19, 2009


CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 19, 2009.


s/Susan Jefferson

-28-

Case Manager